UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS E. PEREZ, Secretary of Labor,
United States Department of Labor,

       Plaintiff,

                                     Case No.  1:14-CV-772

v.

                                     HON. ROBERT HOLMES BELL

SOPHIA'S KALAMAZOO, LLC d/b/a
SOPHIA'S HOUSE OF PANCAKES, a
limited liability corporation, et al.,

       Defendants.

_____/

## **O P I N I O N**

This action under the Fair Labor Standards Act of 1938, as amended ("FLSA"), 29 U.S.C. § 201 *et seq.*, for injunctive relief and to recover unpaid minimum wage and overtime compensation is before the Court on the parties' cross-motions for summary judgment.  (ECF Nos. 24, 26, 28, 30, 32.)  For the reasons that follow, the motions will be granted in part and denied in part.

## **I.**

Plaintiff Thomas E. Perez (the "Secretary") is the Secretary of Labor who is charged with enforcing the FLSA on behalf of the Department of Labor ("DOL").  Defendant Sophia's Kalamazoo, LLC, (Sophia's Kalamazoo) and Defendant Sophia's III, Inc. (Sophia's Benton Harbor) both operate full-service restaurants under the name "Sophia's House of

Pancakes," one in Kalamazoo, and the other in Benton Harbor.  Defendant John P. Filis is an owner and officer of both Sophia's Kalamazoo and Sophia's Benton Harbor.  Defendant Peter P. Philis, John Filis's brother, is the co-owner of Defendant Sophia's Benton Harbor.

The Secretary alleges that Defendants have willfully violated sections 6 and 15(a)(2) of the FLSA by paying many of their employees wages at rates less than $7.25 an hour, and that they have violated sections 7 and 15(a)(2) of the FLSA by failing to compensate their employees at the rate of one and one-half times the regular rate for hours worked in excess of forty hours in a workweek.

The Court has jurisdiction over this action pursuant to sections 16c and 17 of the FLSA and 29 U.S.C. § 1345.  (Stip. ¶ 1, ECF No. 21.)  Sophia's Kalamazoo is an "enterprise" engaged in commerce within the meaning of section 3(s)(1)(A) of the Act.  (*Id.* at ¶ 4.)  Sophia's Benton Harbor is an "enterprise" engaged in commerce within the meaning of section 3(s)(1)(A) of the Act.   (*Id*. at ¶ 5.)

The Secretary seeks backwages for servers of Sophia's Kalamazoo for the investigatory period from September 1, 2010, through January 9, 2012.  (Diaz Decl. ¶ 8.) The Secretary seeks backwages for all employees of Sophia's Benton Harbor for the investigatory period of October 3, 2010 through December 24, 2011. (Christopolous Decl. ¶ 8, ECF No. 25-3; Stip. ¶ 9, ECF No. 21;Christopolous Dep. 42-43, ECF No. 29-1.) Although the Secretary filed his complaint on July 18, 2014, he maintains that his complaint preserved claims occurring on or after October 3, 2011, or October 3, 2010, depending on

2

whether the court applies a two-year or three-year statute of limitations. (Answer to Interrog. No. 4, ECF No. 29-2.)

## II.

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  If the moving party carries its burden of showing there is an absence of evidence to support a claim, then the nonmoving party must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).  The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient to create a genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The proper inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## III.

The Secretary has moved for partial summary judgment.  The Secretary contends that there are no genuine issues of material fact as to eight key issues, and that the Secretary is

entitled to a judgment that Defendants violated the minimum wage, overtime, and record keeping provisions of sections 6, 7 and 11(c) of the Act, an injunction restraining Defendants from further violating these provisions, and a money judgment in the amount of $306,273.90 in unpaid minimum wage and overtime compensation, and an equal amount of liquidated damages for a total of $612,547.80 to be returned to 98 employees for unpaid compensation. (ECF No. 24.)

Defendants have filed four separate motions for partial summary judgment:  by John Filis regarding liability for Sophia's Benton Harbor (ECF No. 26), by Sophia's Benton Harbor and Peter Philis regarding the invalidity of a tolling agreement (ECF No. 28), by all Defendants regarding willfulness (ECF No. 30), and by all Defendants regarding their alleged failure to pay all wages owed and retaliation (ECF No. 32).  Because many of the issues in the parties' motions issues overlap, this opinion is organized by issue rather than the order the motions were filed.

## IV.  Employer Status

The Secretary seeks to hold John Filis and Peter Philis liable as employers under the FLSA.  The parties have stipulated that John Filis is an individual employer with respect to Sophia's Kalamazoo, and that Peter Philis is an individual employer with respect to Sophia's Benton Harbor.  (Stip. ¶¶ 2, 3, ECF No. 21.)  However, John Filis and the Secretary have filed cross-motions for summary judgment on the issue of whether John Filis is an employer in connection with Sophia's Benton Harbor.  (ECF Nos. 24, 26.)

4

Under the FLSA, an "employer" "includes any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d). The term "employer" is construed broadly in light of the remedial purposes of the FLSA. *Dole v. Elliott Travel & Tours, Inc*., 942 F.2d 962, 965 (6th Cir. 1991); *see also Falk v. Brennan*, 414 U.S. 190, 195 (1973) (noting that the FLSA defines "employer" expansively). "[M]ore than one 'employer' can be simultaneously responsible for FLSA obligations." *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994). Whether a defendant qualifies as an "employer" for purposes of the FLSA is a legal determination for the court based on the economic realities presented by the facts of the case. *Elliott Travel*, 942 F.2d at 965.

Sixth Circuit caselaw has established that "[t]o be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions." *Id.* at 966. However, the party must have "'operational control of *significant aspects* of the corporation's day to day functions.'" *Id.* (quoting *Donovan v. Agnew*, 712 F.2d 1509, 1514 (1st Cir. 1983)). What it means to have operational control over significant aspects of the corporation's day to day functions is fleshed out in the case law. In *United States Department of Labor v. Cole Enterprises, Inc*., 62 F.3d 775 (6th Cir. 1995), the Sixth Circuit held that Mr. Cole was an employer the purpose of FLSA liability where the record reflected that he was the president and co-owner of the corporation that owned the restaurant, was engaged in running the business, was authorized to issue checks on the corporate accounts, had custody and control of the employment records, determined employment practices for

5

the restaurant, and was involved in scheduling, payroll, and the hiring of employees. *Id.* at 778. In *Fegley*, the Sixth Circuit held that Mr. Higgins was an employer for purposes of the FLSA where he "was chief executive officer of Foremost, had a significant ownership interest in it, controlled significant functions of the business, and determined salaries and made hiring decisions." 19 F.3d at 1131. In *Elliott Travel*, the Sixth Circuit held that Mr. Schubiner was an employer within the meaning of the FLSA where he was "the chief corporate officer, had a significant ownership interest in the corporation, and had control over significant aspects of the corporation's day-to-day functions, including determining employee salaries." 942 F.2d at 966. Other circuits have similarly required some degree of control over day-to-day functions. *See, e.g.*, *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 34 (1st Cir. 2007) (holding that corporation president was an employer where he had ultimate control over the business's day-to-day operations, was the officer principally in charge of hiring and firing employees, requiring employees to attend meetings unpaid, and setting employees' wages and schedules, and was thus instrumental in "causing" the corporation to violate the FLSA); *Olivas v. A Little Havana Check Cash, Inc.*, 324 F. App'x 839, 845 (11th Cir. 2009) (finding a triable issue as to whether co-owner, corporate officer, and shareholder was an "employer" where she was also a signatory to the company's bank account and managed the business in her husband's absence).

There is no dispute that John Filis is 50% owner of Sophia's Benton Harbor, that he is the president of Sophia's Benton Harbor, and that he owns the building that houses

6

Sophia's Benton Harbor.  (Philis Dep. 18; Resp. to Req. for Admis., 1, 2.)  However, the evidence is also undisputed that John Filis does not pay bills, oversee the payroll, sign checks, review the financial records, or control day-to-day activities at Sophia's Benton Harbor.  (Filis Dep. 169-71; Philis Dep. 27 (stating that, to the extent anyone else controlled day-to-day activities in the restaurant, it was Ms. Fischer, not John Filis)).  The disputed issue is whether John Filis was involved in hiring or firing decisions at Sophia's Benton Harbor.

John Filis has acknowledged that he has the authority to hire and fire employees at Sophia's Benton Harbor.  (Filis Dep. 165-66.)  However, the authority to hire and fire is not evidence of operational control if John Filis did not exercise that authority.  As the Eleventh Circuit has instructed, "unexercised authority is insufficient to establish liability as an employer." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc*., 515 F.3d 1150, 1161 (11th Cir. 2008).

John Filis testified that although he had the authority to hire and fire employees at Sophia's Benton Harbor, he has not hired or fired anyone there.  (Filis Dep. 165-66.)  Peter Philis testified that he was solely responsible for hiring and firing at Sophia's Benton Harbor. (Philis Dep 27.)

The Secretary contends that John Filis not only had authority to hire and fire at Sophia's Benton Harbor, but that he did in fact exercise this authority.   In support of this assertion, the only thing the Secretary relies on is evidence that, on one or two occasions, employees fired by Peter Philis came to John Filis to see if they could get their job back, and

after John Filis spoke to Peter Philis, the employees were rehired.  John Filis testified: "I tell my brother one or two times for people, you know, 'why you not give them their job back?'" (Filis Dep. 166.)  Peter Philis similarly testified that "She gets fired before once and then for somehow, I don't know, they talk to my brother and he calls me and says rah, rah.  I hire them back."  (Philis Dep. 179.)  According to the Secretary, this evidence is sufficient to show that John Filis "overruled his brother" and "exerted his influence" by rehiring employees that Peter Philis had fired.  (ECF No. 25, Page ID.94; ECF No. 36, Page ID.862, 863.)

The exercise of even occasional control can be sufficient to support a finding of operational control.  *See Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982) (noting that occasional control does not diminish the significance of the existence of such control).  However, the Secretary has not produced evidence to support his assertion that John Filis controlled the rehiring of the employees at Sophia's Benton Harbor.  The testimony establishes only that Peter Philis rehired one or two employees after talking to John Filis.  The Secretary has not presented any evidence to suggest that John Filis insisted that Peter Philis rehire these employees or that Peter Philis felt compelled to rehire these employees based on his brother's telephone call.

Viewing the facts in the light most favorable to the Secretary, the Court finds that there is insufficient evidence to suggest that John Filis exercised operational control of significant aspects of the day to day functions of Sophia's Benton Harbor.  There is no

material issue of fact for trial regarding John Filis's liability as an employer in connection with Sophia's Benton Harbor.  Accordingly, the Court will grant John Filis's motion for summary judgment with respect to Sophia's Benton Harbor and deny the Secretary's cross-motion on this same issue.

## V. Recordkeeping

The Secretary moves for summary judgment on his claim that Defendants violated the recordkeeping provisions of § 11(c) and 29 C.F.R. Part 516 by failing to keep records of hours worked for all employees except for servers, and failing to keep records of tips received by servers.  (ECF No. 24.)

The FLSA requires an employer to "make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him."  29 U.S.C. § 211(c).  Required records include "[h]ours worked each workday and total hours worked each workweek," and total wages paid each pay period, including straight-time earnings and premium pay for overtime hours. 29 C.F.R. 516.2(a)(7)-(11).  The records are required to be preserved for a period of at least 2 years. *Id.* at § 516.6(a)(1).  For tipped employees, the employer is also required to maintain and preserve records of the weekly or monthly amount of the tips received and reported by the employee, and the amount by which the tipped employee's wages have been increased using the tip credit.  *Id.* at § 516.28(a)(2), (3).

> The record-keeping requirements are fundamental underpinnings of the Act, for only by relying on employers' records can the Secretary of Labor with his

9

limited facilities hope to be able to enforce the substantive provisions.  Failure to keep accurate records can obscure a multitude of minimum wage and overtime violations.

*Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966).

When the DOL investigator conducted his investigation of Sophia's Kalamazoo in December 2011, he obtained documents showing total hours of work in a workweek, rate of pay, tips received by servers, and gross pay.  However, he only obtained daily start times and end times for servers.  There were no time cards or records of start and end times for any workers other than the servers.  (Diaz Decl. ¶ 4; Ilias Dep. 85.) The Secretary has also produced evidence that while some of the workers at Sophia's Kalamazoo were paid in cash, Sophia's Kalamazoo did not have records of such cash payments.  (Filis Dep. 47, 48, 81; Resp. to Req. for Produc. 15, ECF No. 25-6; Ilias Dep. 45; Filis Decl. ¶ 12, ECF No. 31-6.) There were also no records of the amount collected for tip-sharing with the bussers.  (Filis Dep. 81.) Sophia's Kalamazoo reported tips of $4.98 to $5 an hour for every server for every workweek.  (Diaz Decl. ¶ 7.)  Servers at Sophia's Kalamazoo clocked in using a computerized time clock.  (Filis Decl. ¶ 5, ECF No. 31-6.)  The other employees did not use the computerized time clock.  Aristidis Ilias, the restaurant manager for Sophia's Kalamazoo, reported the cooks' hours based on when they were scheduled to work, and not on the actual times they came in or left.  (Ilias Dep. 39.)  At the end of the week he would verify the hours with the cooks.  (*Id.*; Filis Decl. ¶ 6, ECF No. 31-6.)

With respect to Sophia's Benton Harbor, the DOL investigator stated that, during

10

investigations in December 2011, she obtained payroll records showing each employee's total hours of work, rate of pay, tips received for servers and gross pay. (Christopolous Decl. ¶ 4.) There were no records of the actual hours worked. Although Peter Philis testified that all employees used a time clock with time cards (Philis Decl. ¶ 4, ECF No. 34-9), he did not maintain the records. He testified that he threw out the records every two weeks after the workers were paid. (Philis Dep. 46-47, 111.) The records reflected that each server claimed tips between approximately $5.00 and $5.40 an hour per work week for all work weeks. (Christopolous Decl. ¶ 7.) Sophia's Benton Harbor did not retain records of cash payments to employees such as bussers and cooks. (Christopolous Decl. ¶ 6; Resp. to Req. for Produc. 16, ECF No. 25-6.) Peter Philis acknowledged that some of his employees were not on the payroll because he was paying them in cash. (Philis Dep. 26, 41-42.) He also acknowledged that when he paid them in cash, that information did not go to the bookkeeper. (Philis Dep. 45.)

The Secretary has produced evidence that Defendants failed to maintain records of actual hours worked for anyone other than the servers at Sophia's Kalamazoo; that Defendants failed to maintain records of cash payments to kitchen staff and bussers; that Defendants failed to keep accurate records of tips received by servers; and that Defendants failed to keep records of the tips collected in the tip pool and disbursed to the bussers. Defendants have not produced evidence sufficient to create a genuine issue of material fact with respect to these recordkeeping failures. Accordingly, the Court finds, as a matter of law,

that Defendants violated the FLSA's recordkeeping provisions.

The Secretary's remedy for violations of the record-keeping requirements is injunctive relief. *See* 29 U.S.C. § 217 (authorizing the Secretary to initiate injunction proceedings to restrain violations of 29 U.S.C. § 215(a)(5), which makes it unlawful for an employer to fail to comply with the recordkeeping requirements contained in 29 U.S.C. § 211(c)); *Elwell v. Univ. Hosps. Home Care Servs*., 276 F.3d 832, 843 (6th Cir. 2002). Violations of record-keeping requirements also give rise to a relaxed burden of proof on the Secretary's damages claim for minimum wage and overtime violations. "[I]f the employer kept inaccurate or inadequate records, the plaintiff's burden of proof is relaxed, and, upon satisfaction of that relaxed burden, the onus shifts to the employer to negate the employee's [or DOL's] inferential damage estimate." *Myers v. Copper Cellar Corp*., 192 F.3d 546, 551 (6th Cir. 1999) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)). The plaintiff can carry that relaxed burden by proving that employees in fact performed work for which they were improperly compensated and by producing "'sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Reich v. Petroleum Sales, Inc*., 30 F.3d 654, 658 (6th Cir. 1994) (quoting *Mt. Clemens*, 328 US. at 687). The burden then shifts to the employer to come forward with evidence to rebut the reasonableness of the plaintiff's inference. *Id.* at 687-88. "'If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 688.) "*Mt. Clemens Pottery*

12

and its progeny do not lessen the standard of proof for showing that a FLSA violation occurred.  Rather, *Mt. Clemens Pottery* gives a FLSA plaintiff an easier way to show what his or her damages are."  *O'Brien v. Ed Donnelly Enterprises, Inc.*, 575 F.3d 567, 602 (6th Cir. 2009).

## VI.  Overtime

The Secretary moves for summary judgment on his claim that Defendants failed to pay kitchen staff for overtime worked.  (ECF No.  24.)  Defendants have filed a cross-motion for partial summary judgment regarding their alleged failure to pay all wages owed.  (ECF No. 32.)

The Secretary has presented evidence that kitchen staff at Sophia's Kalamazoo regularly worked over 40 hours each week.  (Ilias Dep. 24-31.) However, the accounting records showed that they were rarely paid overtime.  (ECF No. 25-11.)

In response, Defendants have presented John Filis's testimony evidence that all employees were paid everything they were due, including all overtime pay.  (Filis Dep. 162; Filis Decl. ¶ 7, ECF No. 33-3.)  Some of the employees' wages were paid in whole or in part in cash.  (Filis Dep. 46; Ilias Dep. 41, 121-22; Filis Decl. ¶ 12, ECF No. 33-3.)  Ilias testified that if the cooks said they worked extra hours, he would take their word for it and pay them for the extra time.  (Ilias Dep. 39.)  According to Filis, paying the non-servers on the basis of the schedule rather than a time clock worked to the employees' benefit because they generally worked less hours each week than they were scheduled to work.  (Filis Decl. ¶ 8,

ECF No. 31-6.)

With respect to Sophia's Benton Harbor, the Secretary has presented evidence that in 2010 it paid only two hours of overtime, and in 2011 it paid no overtime.  In 2012, after the investigation, it paid 2100 hours of overtime despite the fact that the restaurant was open fewer hours than in 2011.

In response, Defendants have presented Peter Philis's testimony that all employees were on the time clock at Sophia's Benton Harbor, and that he paid them all at least a minimum wage and a premium for all overtime hours.  (Philis Dep. 42, 44, 155-56; Philis Decl. ¶ 5, ECF No. 33-8.)  If someone worked over 40 hours, it showed on the time card and he put it down as overtime.  (Philis Dep. 156.)  Philis also testified that he would pay time and a half in cash, and that if he called a cook in to work an extra shift, he would pay the cook $90 to $100 in cash.  (Philis Dep. 121-22.)  He did not, however, maintain a record of those cash payments.  (*Id.* at 122.)  Philis also testified that his restaurant was much busier in 2012, which accounted for increased overtime, and that the overtime hours decreased again in 2013 and 2014. Even though the restaurant was open fewer hours in 2012 than in 2011, employees worked longer hours because they were not cut as early.  (Philis 2d Decl. ¶ 5, ECF No. 34-7.)

Defendants have also presented evidence that some of the employees from both Kalamazoo and Benton Harbor advised the DOL that they believed they were paid for all the hours they worked.  (ECF Nos. 33-5, 33-10.)

Although Defendants have not maintained evidence of overtime hours, and although they did not report overtime pay to their accountant, that does not necessarily mean that they did not record overtime hours or compensate their employees for overtime hours. Defendants' lack of documentation may be used against them at trial. Nevertheless, the lack of documentation is not alone sufficient to establish a violation of the overtime provisions. Whether or not Defendants paid their employees overtime depends on their credibility. The Court is satisfied that there are genuine issues of material fact regarding overtime payments that are better addressed at trial.

## VII. Minimum Wage

The parties have filed cross-motions for summary judgment on the issue of whether Defendants violated the minimum wage provisions with respect to the servers. (ECF Nos. 24, 32.)

The FLSA requires employers to pay its tipped employees a minimum cash wage in addition to a tip credit adding up to the minimum wage. 29 U.S.C. § 203(m);[1] 29 C.F.R.

---

[1]The FLSA's definition of "wage" includes the following with respect to wages of tipped employees:

In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to--

(1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and

(continued...)

§ 531.50.

The Secretary contends that Defendants are not eligible for the tip credit because they failed to inform their servers of the tip credit provisions and because they did not permit the servers to retain all of their tips when they required the servers to pay $2.00 per hour into a tip pool for the bussers.

The FLSA and its regulations permit an employer to claim a "tip credit" to offset a portion of its minimum wage obligation only if certain requirements are met. In order to qualify for a tip credit the employer must inform the employee of the tip credit provisions and all tips must be retained by the employee. 29 U.S.C. § 203(m); *see also* 29 C.F.R. § 516.28(a)(3) ("The amount per hour which the employer takes as a tip credit shall be reported to the employee in writing each time it is changed from the amount per hour taken in the preceding week."); 29 C.F.R. § 531.54 ("[A]n employer must notify its employees

---

[1](...continued)
> (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206(a)(1) of this title.

> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

29 U.S.C. § 203(m).

of any required tip pool contribution amount, may only take a tip credit for the amount of tips each employee ultimately receives, and may not retain any of the employees' tips for any other purpose."). The employer bears the burden of proving that it is entitled to take a tip credit. *Pedigo v. Austin Rumba, Inc.*, 722 F. Supp. 2d 714, 724 (W.D. Tex. 2010). Based on the evidence presented, the Court is satisfied that there are numerous questions of fact that preclude entry of summary judgment for either party with respect to the tip credit.

The Secretary has presented evidence that Defendants did not give the servers notice of the tip credit (Philis Dep. 121, Ilias Dep. 81, Filis Dep. 83-84); that Defendants did not ensure that the tip credit did not exceed the value of the tips actually received by an employee (Philis Dep. 120, Ilias Dep. 57); that Defendants did not discuss the tip pooling arrangement with their accountant  (Filis Dep. 86); and that Defendants did not maintain any records of the amount of money collected from the servers or given to the bussers.  (Philis Dep. 201; Filis Dep. 79, 81.)  Individual servers at Sophia's Kalamazoo  reported that their employer required the $2 per hour tip pooling and took the tips from the servers' credit card tips before the balance of those tips were given to the servers.  (Employee Statements, ECF No. 33, Page ID.668, 670.)  Individual servers at Sophia's Benton Harbor similarly stated that they were required to pay at least $2.00 an hour into a tip pool and that they were required to record a set amount as tips, regardless of the amount actually received.  (Musto Decl. ¶¶ 4, 5; Campbell Decl. ¶¶ 4, 5.)

Defendants have presented contrary evidence, or evidence that supports a contrary

inference.  With respect to Sophia's Kalamazoo, John Filis testified that he told all of his employees at a meeting that they had to report their tips, and that if they did not go over minimum wage, the restaurant had to pay the difference.  (Filis Dep. 82.)  As new servers were hired, he usually told them "Okay.  You going to do your tips.  You're going to do the difference -- we're going to pay you the difference to go the minimum wage.  (Filis Dep. 83.)  In his declaration he clarified that he, the manager, or the head server explained the tip credit and the bussers tip pool to the servers.  (Filis Decl. ¶¶ 9-10, ECF No. 31-6.)  John Filis testified that they were always open to conversation with the waitresses about how they were being paid, and he knew that his waitresses were probably making $15 an hour in tips.  (Filis Dep. 88.)

Peter Philis similarly stated that either he or the head server explained the tip credit to the servers.  (Philis Decl. ¶ 6.)  Peter Philis testified that the servers self-reported their tips on the back of a card.  (Philis Dep. 118.)  Although Philis did not ask the servers how much they made in tips, and although he testified that he threw away credit card receipts showing tips after a month, he testified that everyone knew what tips were left on credit cards.  (Philis Dep. 116-17, 120.)  Philis also testified that he was generally aware of how much the servers made in cash tips from seeing them counting their tips at the end of the day and from what he observed when they made change for him.  (Philis 2d Decl. ¶ 7.)

Christine Alexopoulos, the office manager for Defendants' accountant, stated that records for 2011 disclosed that servers at Sophia's Benton Harbor  received, on average,

$4.83 in credit card tips, and the servers at Sophia's Kalamazoo received, on average, $5.16 per hour in credit card tips.  Based on his observations, Peter Philis believes that servers generally received substantially more in cash tips than in credit card tips.  (Philis 2d Decl. ¶ 7.)  John Filis and Peter Philis are "confident" that combining the cash, wages, and tips, servers always earned more than the minimum wage in a workweek.  (Filis Decl. ¶ 9, ECF No. 31-6; Philis Decl. ¶ 6, ECF No. 31-9.)

Both restaurants operated a tip pool for bussers.  At both restaurants, the tips were collected by the employer.  With respect to Sophia's Kalamazoo, there is evidence that the bussers tips were included in the bussers' paychecks to bring their checks up to minimum wage.  (Ilias Dep. 47-49.)  In the case of Sophia's Benton Harbor, there is evidence that the bussers were paid minimum wage plus tips from the tip pool.  (Philis Dep. 48.)  Neither restaurant maintained any records of the amount of tips received from the servers or the amount of tips distributed to the bussers.  Although Peter Philis maintained that the restaurant did not keep any of the tip pool money, he has no records to support his assertion.  (Philis Dep. 201.)

Both John Filis and Peter Philis testified that tip pooling was a voluntary practice that was instituted at the request of the servers.  (Filis Dep. 85; Philis Dep. 47, 118-19.)  John Filis never explained the tip pooling arrangement to the new servers; they learned about it from the older servers.  (Filis Dep. 85.)  Peter Philis explained that although he collected the $2 per hour, it was not mandatory, and sometimes servers refused to pay in if they did not

19

make much in tips.  (Philis Dep. 119.)  According to Peter Philis, the servers were given all of their tips, and then they decided what amount to leave the bussers.  (Philis Dep. 196.)

Based on the evidence presented, the Court is satisfied that there are questions of fact as to whether servers were informed of the tip credit, and whether the servers retained all of their tips and paid into the bussers' tip pool voluntarily, or whether their employer deducted the tip pool money before the servers received their credit card tips.  These questions preclude the Court from finding for either party on the issue of whether Defendants violated the minimum wage provisions of the FLSA.

## VIII.  Retaliation

Defendants have requested summary judgment on the Secretary's claim that Defendants John Filis and Peter Philis retaliated against server Erica Campbell[2] for reporting FLSA violations to the Wage and Hour Division.  (ECF No. 32.)

Section  15(a)(3) of the FLSA makes it unlawful to "discharge or in any other manner discriminate" against any employee for initiating or participating in an FLSA proceeding. 29 U.S.C. § 215(a)(3).

Defendants move for summary judgment on the Secretary's retaliation claim based on their contention that  there is insufficient evidence of retaliation for the claim to survive. According to Defendants, Campbell was terminated for screaming obscenities at Philis in the

---

[2]The Secretary has stipulated that it will dismiss with prejudice its retaliation claims on behalf of Cindy Gales and Michelle Thomas.  (Stip. ¶ 6, ECF No.  21.)

restaurant dining room, not because of her involvement in the FLSA investigation.  (Philis Decl. ¶ 13, ECF No. 31-9.)

In support of his claim, the Secretary has presented evidence that after learning that Campbell had spoken with the Wage and Hour investigators, Peter Philis reduced her work opportunities, called her names, and threatened to fire her.  (Musto Decl. ¶¶ 8-12, ECF No. 39-1; Campbell Decl. ¶¶ 6-10, ECF No. 39-2.)  The Secretary has also presented evidence that  Campbell was told she was fired for chewing gum, and that, contrary to Peter Philis's assertions, Campbell did not yell at Philis before she was terminated.  (Musto Decl. ¶ 14; Campbell Decl. ¶ 14-16.)

The parties have presented sufficient evidence to create a material issue of fact for trial regarding as to whether Campbell's termination violated § 15(a)(3) of the FLSA.

## IX.  Third Tolling Agreement

The statute of limitations for claims for ordinary violations of the FLSA is two years, but it is extended to three years for willful violations.  29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 (1988).

Following the Secretary's investigation into the employment practices at Sophia's Kalamazoo and Sophia's Benton Harbor, the Secretary agreed to withhold immediate institution of legal proceedings against Defendants in consideration for Defendants' agreement to waive the running of the statute of limitations.  Both John Filis and Peter Philis signed the first tolling agreement for the period from September 30, 2013, through November

15, 2013, and the second tolling agreement for the period from November 15, 2013, through March 15, 2014, on behalf of Sophia's Benton Harbor.  (Ex. Q, ECF No. 25; Exs. 3, 4, ECF No. 29.)  Attorney Keith N. Grafos signed the third tolling agreement for the period from March 15, 2014, through July 15, 2014, on behalf of Sophia's Benton Harbor, John Filis, and Pete Philis.  (Ex. Q, ECF No. 25; Ex. 5, ECF No. 29.)

Sophia's Benton Harbor and Peter Philis assert that the third tolling agreement is unenforceable against them because Attorney Grafos did not represent them, did not have their consent to sign the tolling agreement on their behalf, and did not have apparent authority to sign the agreement on their behalf.[3]  According to Peter Philis, Attorney Grafos represented only John Filis and Sophia's Kalamazoo.

The Secretary opposes Defendants' motion for summary judgment based on waiver, equitable tolling, apparent authority, and improper forum.

The Secretary contends that Defendants waived the claim by failing to raise it in their affirmative defenses, their Rule 26(a)(1) disclosures, or their responses to the Secretary's interrogatories.

Defendants raised a general statute of limitations affirmative defense.  (Affirmative Defense No. 3, ECF No. 9.)  In response to interrogatories seeking clarification of the

---

[3]According to Defendants Peter Philis and Sophia's Benton Harbor, if the third tolling agreement is invalid as to them, the Secretary would have no claim against them under the two year statute of limitations, and only an eleven month claim against them if the three year statute of limitations applies.

defense, Defendants responded:

> Defendants believe a two-year statute of limitations applies and Plaintiff is attempting to recover damages barred by the statute, even accounting for tolling agreements. Even with a three-year statute of limitations, Plaintiff appears to be attempting to recover barred damages.

(Answer to Interrog. No. 7, ECF No. 37-1.)  Defendants did not explain what damages were barred.  The response gave no indication of any claim challenging the validity of the tolling agreement.  While a claim that the tolling agreement is invalid would be consistent with Defendants' responses, it was not raised in the responses.

In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense. Fed. R. Civ. P. 8(c).  The failure to raise an affirmative defense may, but does not always, result in a waiver of the defense. *See Seals v. Gen. Motors Corp.*, 546 F.3d 766, 770 (6th Cir. 2008).

The alleged invalidity of the Tolling Agreement is an affirmative defense.  Peter Philis's statement in his deposition that he was not represented by Attorney Grafos (Philis Dep. 163) is not sufficient to give the Secretary notice of his intent to raise the defense regarding the alleged invalidity of the tolling agreement.   Nevertheless, the Court is not inclined to find a waiver because the Secretary has not indicated any prejudice from Defendants' failure to raise the affirmative defense in its answer.  The information would only have been useful to the Secretary before he filed his complaint.  By the time Defendants filed their answer, the Secretary was no longer in a position to file the suit earlier in order to make up for an allegedly invalid third tolling agreement.

23

Even assuming Defendants did not waive the argument regarding the invalidity of the tolling agreement, however, Defendants are not entitled to summary judgment because the Court finds that the Secretary reasonably relied on Attorney Grafos's apparent authority to sign the agreement.

Defendants contend that Attorney Grafos did not represent Peter Philis or Sophia's Benton Harbor and did not have apparent authority to sign on their behalf because Peter Philis did not do anything to place Attorney Grafos in a position where he appeared to the Secretary to be acting on behalf of Sophia's Benton Harbor or Peter Philis of Peter Philis, and because an agent cannot create apparent authority by his own statements or conduct.

It is well-established that "[w]here a principal cloaks his agent with apparent authority to do an act not actually authorized, the principal is bound thereby." *Cent. Wholesale Co. v. Sefa*, 87 N.W.2d 94, 98 (Mich. 1957) (quoting *Michael v. Kircher*, 56 N.W.2d 269, 270 (Mich. 1953)).  However, "[a]gency cannot be established by declarations of the agent alone." *Miskiewicz v. Smolenski*, 227 N.W. 789, 792 (Mich. 1929).  It "must be established by tracing its source to some word or action of the alleged principal." *Id.*  Michigan courts follow the rule on apparent authority set forth in Corpus Juris Secundum:

> "Whenever the principal, by statements or conduct, places the agent in a position where he appears with reasonable certainty to be acting for the principal, or without interference suffers the agent to assume such a position, and thereby justifies those dealing with the agent in believing that he is acting within his mandate, an apparent authority results which replaces that actually conferred as the basis for determining rights and liabilities.  The measure of authority consists of those powers which the principal has thus caused or permitted the agent to seem to possess, whether the agent had actual authority

> being immaterial if his conduct was within the apparent scope of his powers; the question involved is no longer what authority was actually given or was intended by the parties to the agency agreement, but resolves itself instead into the determination of what powers persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe him to have on the basis of the principal's conduct."

*Id*. (quoting  2 C.J.S. Agency § 96(b), pp. 1210, 1211).

The Secretary has produced evidence that on October 17, 2013, Donald Bleich called Emelda Medrano, counsel for the DOL, and told her that he was the attorney for Peter Philis and Sophia's Benton Harbor; on October 24, 2013, Bleich advised Medrano that he represented both Peter Philis and John Filis, that he would refer the case to Grafos, and that she could communicate with Grafos; on the same day, Bleich sent Medrano an email with a Tolling Agreement signed by Peter Philis; on the same day, Medrano spoke with Grafos regarding the allegations against both restaurants; on February 4, 2015, Grafos told Medrano he would send her copies of the Second Tolling Agreements for both restaurants; on February 5, 2014, Medrano received a letter from Grafos with copies of the Second Tolling Agreement for Sophia's Benton Harbor signed by both Peter Philis and John Filis.  (Medrano Decl. ¶¶ 6-9, 12, 13.)

In their reply brief, Defendants have attached deposition testimony from Peter Philis and declarations from Attorneys Bleich and Grafos.  Bleich does not deny that he was Peter Philis's attorney, that he contacted Medrano on behalf of Peter Philis, or that he told Medrano that he would be referring the case to Grafos.  He only disputes Medrano's assertion that he referred Peter Philis to Grafos.  (Bleich Decl. ¶ 4, ECF No. 45-1.)  Grafos disputes telling

Medrano that he would send a tolling agreement for Peter Philis and Sophia's Benton Harbor, and he disputes sending the tolling agreement for Peter Philis and Sophia's Benton Harbor to her. (Grafos Decl. ¶¶ 8, 10, ECF No. 45-2.) Peter Philis denies talking about the case with Grafos. (Philis Dep. 162-63.) Grafos denies representing Peter Philis, but he does not deny telling Medrano that he met with both Peter Philis and John Filis to discuss the case. (Grafos Decl. ¶ 4.)

If Bleich was Peter Philis's attorney, then it was reasonable for the Secretary to rely on Bleich's statements because statements Bleich made to Medrano would have been the statements of an actual agent on matters within the scope of the attorney client agency relationship. Accordingly, if Bleich told Medrano that he was referring the case against Peter Philis and Sophia's Benton Harbor to Mr. Grafos and that she could communicate with Mr. Grafos in the future, it would be reasonable for Medrano to believe that Mr. Grafos represented Peter Philis and Sophia's Benton Harbor. However, given the declarations of Mr. Grafos and Mr. Bleich, it appears that there are questions of fact as to what Ms. Medrano heard from Mr. Bleich and from Mr. Grafos. Accordingly, the Court cannot determine whether or not Ms. Medrano reasonably believed that Attorney Grafos represented Peter Philis and Sophia's Benton Harbor.

To the extent Defendants take issue with representations made by their attorney, the proper forum to raise an alleged violation of the Michigan Rules of Professional Conduct is the Michigan Attorney Grievance Commission, not this Court. *See* Mich. Ct. R. 9.108(E)(2)

(authorizing the Commission to investigate alleged attorney misconduct); *Mr. S. v. Rochester Cmty. Sch.*, No. 5:06-CV-53, 2006 WL 2830042, at *10 (W.D. Mich. Oct. 2, 2006).

## X.  Willfulness

As previously noted, the statute of limitation for FLSA back-wages claims is extended from two to three years if the violation is willful.  29 U.S.C. § 255(a).  The parties have filed cross-motions for summary judgment on the issue of whether Defendants willfully violated the FLSA.  (ECF Nos. 24, 30.)

The Secretary bears the burden of proving that the violation was willful. *Richland Shoe*, 486 U.S. at 135; *Elliott Travel*, 942 F.2d at 966-67.  A violation is willful if the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Richland Shoe*, 486 U.S. at 133.  Mere negligence is not sufficient to prove willfulness.  *Id.*  The willfulness determination is a mixed question of law and fact. *Alvarez v. IBP, Inc.*, 339 F.3d 894, 908 (9th Cir. 2003); *Reich v. Monfort*, 144 F.3d 1329, 1334 (10th Cir.1998)

In *Elliott Travel* the court found willfulness where the employer had actual notice of FLSA requirements as a result of earlier violations, had agreed to pay unpaid overtime wages, and had assured future compliance with the FLSA.  942 F.2d at 967.  Even in *Donovan v. Carls Drug Co.*, 703 F.2d 650 (2d Cir. 1983), a case the Secretary relies on, the court's willfulness finding was based in part on evidence that the employer had been previously investigated, even though those investigations did not result in prosecution.  *Id.*

27

at 653.  In *Alvarez v. IBP*, the court found willfulness where the employer was on notice of its FLSA responsibilities, yet took no affirmative action to ensure compliance with them, and took actions that could be characterized as attempts to evade compliance, or to minimize the actions necessary to achieve compliance.  339 F.3d at 909.  In *Ramos v. Al-Bataineh*, 599 F. App'x 548 (5th Cir. 2015), the court found that the employer's violations were willful where evidence revealed that he was aware that his employee had regularly worked overtime, but he kept no records and failed to pay her for the overtime hours.  *Id.* at 551.

Courts have declined to find willfulness where an employer tried, albeit unsuccessfully, to comply with FLSA.  *See*, *e.g.*, *Reich v. Newspapers of New England, Inc*., 44 F.3d 1060, 1080 (1st Cir. 1995) (holding that violation was not willful where employer tried unsuccessfully to comply with outdated DOL interpretations regarding exemptions for journalists); *Brock v. Claridge Hotel & Casino*, 846 F.2d 180, 188-89 (3d Cir. 1988) (holding that violation would not be willful if it was based on a good faith disagreement with the DOL's interpretation of what was required); *Fowler v. Incor*, 279 F. App'x 590, 602 (10th Cir. 2008) (finding no willfulness where the employer relied on the advice of industry consultants and state officials in implementing a policy that was in widespread use).

The Secretary contends that Defendants willfully violated the minimum wage and overtime requirements because they knew of the FLSA's requirements, knew some employees worked over 40 hours in a week, failed to record and maintain hours worked, took a tip credit without following the requirements, failed to record and maintain the amount of

28

tips earned by servers, inaccurately reported tips to their accountant, required servers to participate in an invalid tip-pooling arrangement, and made cash payments. The Secretary contends that Defendants' willfulness is further evidenced by the fact that Defendants had been in the restaurant business for many years and by Defendants' failure to keep required records.

The Secretary, citing *Carls Drug*, 703 F.2d at 652, has asserted that to show willfulness, the plaintiff need only show that Defendants knew that their business was subject to the FLSA and failed to conform their practices to FLSA requirements. As the Second Circuit itself has pointed out, the *Carls Drug* standard is no longer good law because the Supreme Court subsequently adopted a more rigorous test of willfulness. *Brock v. Superior Care, Inc*., 840 F.2d 1054, 1062 (2d Cir. 1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126 (1985) (adopting the actual knowledge or reckless disregard test)).

Defendants contend that the Secretary's evidence is legally insufficient to support a finding of willfulness because their conduct reflects negligence at best. Defendants contend that although they were aware of the minimum wage and overtime requirements of the FLSA, they did pay the required wages, and had no reason to believe that their tip pooling, cash payment, or record-keeping practices violated the FLSA. Defendants further assert that their actions were not willful because they discussed the FLSA's requirements with their accountant, and he did not advise them that they were not complying with the law.

Whether Defendants acted willfully depends on their knowledge, motive, and/or

29

intent, a finding that is not well-suited to summary disposition. *Fowler v. Incor*, 279 F. App'x 590, 602 (10th Cir. 2008). Here, the extent of Defendants' knowledge of the FLSA requirements, and the information Defendants shared with and received from their accountant is not clear. Moreover, there is no bright line between reckless and negligent conduct. The parties have presented evidence from which reasonable inferences can be made that the Defendants acted recklessly or that they only acted negligently. Accordingly, the parties' cross-motions on the issue of willfulness will be denied.

## XI.  Calculation of Wages Due

The Secretary has moved for summary judgment pursuant to section 16(c) of the Act ordering payment in the amount of $306,273.90 and for an equal amount of liquidated damages for a total of $612,547.80 to be returned to 98 employees for unpaid compensation. (ECF No. 24.)  Defendants have filed a cross-motion for partial summary judgment.  (ECF No. 32.)  Defendants contend the evidence establishes that they paid all wages owed.

The Secretary contends that Defendants owe $6.60 per hour in back wages.  The Secretary's back wage calculation is based on the premise that the servers were paid only 65 cents per hour, far below the required minimum cash wage payment of $2.13 per hour under § 203(m) of the FLSA.  (Resp. to Interrog. No. 6, ECF No. 33-1.)  The Secretary does not deny that the servers received paychecks showing a wage of $2.65 per hour.  Neither does the Secretary deny that Defendants reported sufficient tips to reach the minimum wage. However, according to the Secretary, Defendants can only be credited with paying the servers

65 cents per hour because they fail to qualify for the tip credit and because they must repay the $2.00 per hour from the invalid tipping pool.

Defendants note that the lack of records does not necessarily amount to a failure to pay. They have come forward with evidence from John Filis and Peter Philis that they paid their employees all wages due. They have also come forward with evidence that during the DOL's investigation, at least some employees confirmed that they had been paid in full. Defendants' evidence is sufficient to create material issues of fact for trial with respect to whether the Secretary's calculations are justified by a reasonable inference. Accordingly, the Court will deny the Secretary's request for summary judgment on the issue of damages.

Defendants contend that the Secretary has not come forward with any admissible evidence to defeat their cross-motion for summary judgment on the issue of damages. Defendants contend that the declarations of investigators Diaz and Christopoulos regarding amounts due are based on inadmissible hearsay from the employees they interviewed. Defendants note that the Secretary has not produced a statement from a single employee who claims that he or she was not paid all amounts owed. Defendants further contend that the Secretary cannot rely on representative testimony because the employees have given conflicting statements on whether or not they were paid in full. According to Defendants, because no one employee is representative of how all the employees were paid, the Secretary must present evidence as to each and every employee who claims he or she was not paid in full.

31

The Court disagrees with Defendants' assertion regarding the Secretary's burden of proof. In light of Defendants' record-keeping failures, the Secretary is entitled to a relaxed burden of proof on the issue of damages. *Myers*, 192 F.3d at 551. Of course, the Secretary must still produce "sufficient evidence" to show that his damage calculation is "a matter of just and reasonable inference." *Petroleum Sales*, 30 F.3d at 658. In determining the amount of back wages due it is appropriate for the Court to consider the investigators' estimates drawn from employee interview statements, employment records, and employee testimony at trial. *United States Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 772, 781 (6th Cir. 1995). "It is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages. The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations." *Martin v. Selker Bros.*, 949 F.2d 1286, 1298 (3d Cir. 1991). Whether or to what extent the employee statements relied on are representative is an issue of fact for trial. The Secretary has also produced wage and hour documentation in support of his contention that employees were not paid all overtime due. Although Defendants question the validity of the Secretary's assumptions with respect to whether workers worked the same hours each workweek, the validity of such underlying assumptions is an issue of fact for trial. Finally, certain inferences may be just and reasonable in light of Defendants' failure to maintain the required records and their failure to report cash payments on their taxes. Whether the Secretary will be able to support its claim for damages is a question of fact for trial. Accordingly, the Secretary's

32

motion for summary judgment on the amount of damages, and Defendants' cross-motion for a finding that they paid all wages due will be denied.

## XII.  Liquidated Damages

Section 16(b) of the FLSA provides that an employer who violates the overtime compensation provisions of the FLSA "shall be liable" for liquidated damages in an amount equal to unpaid back wages.  29 U.S.C. § 216(b).  If the employer shows that he acted in "good faith" and had "reasonable grounds" for believing he was not violating the FLSA, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title." 29 U.S.C. § 260.  Based upon the statutory language, the Sixth Circuit has concluded that the court may, in its discretion, refuse to award liquidated damages "if, and only if, the employer shows that he acted in good faith and that he had reasonable grounds for believing that he was not violating the Act." *Elliott Travel*, 942 F.2d at 967 (quoting *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir.1982)).  "To be relieved of liability for liquidated damages, the employer 'has the "substantial burden" of proving to the satisfaction of the trial court that its acts giving rise to the suit are *both* in good faith *and* reasonable.'" *Id.* at 968 (quoting *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1415 (5th Cir.1990) (emphasis in original)).

The Secretary moves for summary judgment on the issue of liquidated damages.  The Secretary contends that Defendants cannot establish a good faith and reasonable grounds for believing that they were not violating the act.  First, the Secretary contends that because

Defendants' violations were willful, this is dispositive on the question of liquidated damages. *See Herman v. Palo Grp. Foster Home, Inc.*, 183 F.3d 468, 474 (6th Cir. 1999). Even if Defendants violations were not willful, the Secretary contends that Defendants cannot establish the subjective good faith and objective reasonableness of their actions because they have no documents showing they took any steps to determine if their practices met the FLSA's requirements, and Peter Philis admitted that he did not discuss the tip pool practice with his accountant or the DOL. (Philis Dep. 161-62.)

Defendants contend that liquidated damages are not appropriate because they acted in good faith as evidenced by the fact that they spoke with their accountant about their payroll practices, and the accountant never suggested that the restaurant was violating the FLSA or advised Defendants to change any of their payroll practices, including the tip pooling for the bussers. (Filis Decl. ¶ 13, ECF No. 31-6.) Defendants also contend that their good faith is evidenced by the fact that they changed their practices after the DOL's investigation when they learned what they needed to do to comply with the FLSA.

The Secretary contends that Defendants' reliance on the accountant's silence cannot be deemed good faith because Defendants did not alert the accountant to their tip pooling and cash payment practices. The Secretary points to John Filis's admission that he never told the accountant about the tip pool practices (Filis Dep. at 86), and to Peter Philis's admission that cash payments were not included in the accountant's records (Philis 2d Decl. ¶ 5, ECF No 34-7).

34

Reliance on an accountant's advice depends on what was disclosed to the accountant, what was knowingly hidden from the accountant, and what advice was given by the accountant. Defendants' accountant, Nicholas Vardalos, died after the DOL investigation began. There is no dispute that Mr. Vardalos was aware that the tips reported on the records were the same every workweek with no variation, but there is no evidence that he counseled Defendants with respect to the manner in which they were reporting tips. (Diaz Mem., ECF No. 43-1.) There is conflicting evidence about what advice Mr. Vardalos gave John Filis with regard to the bussers, and when such advice was given. (Diaz Mem.; Diaz Dep. 69-70, ECF No. 31-5.) There are also questions of fact about whether Defendants knew that their practices were questionable or wrong. The Court is satisfied that there are questions of fact for trial on the issue of whether Defendants acted in good faith.

### XIII. Prospective Injunction

The Secretary seeks summary judgment on its claim for a prospective injunction under Section 17 of the FLSA.

The Fifth Circuit has held that "'when an employer, without excuse or explanation, violates the provisions of the Fair Labor Standards Act the district court as a general rule should issue an injunction restraining the employer from further violations.'" *Wirtz v. Mississippi Publishers Corp.*, 364 F.2d 603, 606-07 (5th Cir. 1966) (quoting *Goldberg v. Mathews*, 303 F.2d 814, 817 (5th Cir. 1962).

Even though some record-keeping violations of the FLSA have been established on

the cross-motions for summary judgment, entry of prospective injunctive relief should await trial when the scope of the violations is more clearly established.

## XIV.  Conclusion

For the reasons stated herein, the Court will grant the Secretary's motion for summary judgment on the issue of record-keeping violations and deny the motion as to all remaining issues.  The Court will grant Defendant John Filis's motion regarding liability for Sophia's Benton Harbor (ECF No. 26), deny Sophia's Benton Harbor and Peter Philis's motion regarding the invalidity of a tolling agreement (ECF No. 28), deny Defendants' motion regarding willfulness (ECF No. 30), and deny Defendants' motion regarding their alleged failure to pay all wages owed and retaliation (ECF No. 32.)

An order consistent with this opinion will be entered.


Dated: <u>November 17, 2015</u>                       <u>/s/ Robert Holmes Bell</u>
                                                    ROBERT HOLMES BELL
                                                    UNITED STATES DISTRICT JUDGE